A. W. KING, Appellee, v. MENDOTA COAL Co., Appellant.

**Mines and mining:** NEGLIGENCE: SAFE PLACE TO WORK: EVIDENCE:
1 INSTRUCTIONS. Plaintiff, a coal miner, was injured by the fall of
rock from the roof of the mine, at a point where he had a right to
be in the prosecution of his work, and where it was the duty of
the master to furnish a safe place. All miners were required to
furnish their own tools, but plaintiff needing additional tools had
borrowed some of a fellow workman and after returning the same
was injured while returning to and near his place of work. *Held,*
that evidence of a custom among miners, known to the employer,
of borrowing tools from each other when needed was admissible;
and that it could not be said as a matter of law that plaintiff in
borrowing and returning the tools was pursuing a purpose of his
own distinct from his employment, and this question was properly
submitted under appropriate instructions.

**Practice:** MOTION TO DIRECT VERDICT: WAIVER. Where defendant did
2 not stand on a motion to direct a verdict, but plaintiff was per-
mitted to introduce further evidence, and defendant submitted his
evidence, the motion to direct the verdict was waived and the only
question arising upon the appeal was the sufficiency of the entire
evidence to support the verdict.

**Appeal:** ERRONEOUS RULINGS: HARMLESS ERROR. Erroneous rulings
3 upon immaterial evidence and undisputed questions of law, not
effecting the real merits of the case, are not ground for reversal.

*Appeal from Appanoose District Court.*—HON. F. W. EICH-
ELBERGER, Judge.

THURSDAY, OCTOBER 23, 1913.

ACTION at law to recover damages for injuries received by
plaintiff while in defendant's employ in a coal mine in Appa-
noose county. Trial to a jury, verdict and judgment for
plaintiff, and defendant appeals. *Affirmed.*

*Porter & Greenleaf,* and *Mastin & Sherlock,* for appellant.

*Howell & Elgin,* for appellee.

DEEMER, J.—Plaintiff is a coal miner, and on the 21st day of January, 1910, was in defendant's employ, engaged in what is known in mining parlance as "driving a header." In the performance of his work he entered the mine from the main shaft; then went through what was known as the west entry from the bottom of the shaft, until he came to the fifth north entry, running north from the west entry, whither he went until he came to his "header." At the time in question plaintiff was breaking a header turned off from the east side of this fifth north entry. This header was twelve feet long, and, as we understand it, eight feet wide, and some thirty inches high, made to get air from the main entry into the fourth north entry. Plaintiff was paid by the ton when mining, and by the yard when breaking headers. As was the custom in this and in other mines, he, like the other miners engaged in the same sort of work, furnished his own tools. There is some dispute as to just what plaintiff was doing when he was injured. Defendant says the most that can be claimed for plaintiff is that he was returning some wedges which he had borrowed from a fellow workman, and just as he had returned them and was starting back to his room, and while at a point just north of the corner of the last "break-through" on the fifth entry north, some of the roof of the mine fell upon him, and he received the injuries of which he complains. Defendant also says that at the time he was not engaged in any other work, save the return of borrowed tools; that this was entirely for his own purposes; that he was not in an entry which he was authorized to pass through in going or returning from his place of work; that the day before the accident he had passed through the entry from which the roof fell, walking in such position that the lamp from his cap would be near the roof; that the day before the accident all loose rock had been re-

moved from the roof of the entry; and that it had no knowledge of any defects therein on the day the accident occurred. Moreover, it introduced testimony tending to show that instead of returning any tools, plaintiff was returning from, or was simply on a visit to, some fellow workmen at the time the roof fell.

Plaintiff's counsel contend that at the time of the accident a break-through, running west about ten feet, north of the place where plaintiff was working, was used by him as a place for keeping his empty cars; that it was his duty to remove the material broken down while driving the header; that on the day of the accident he had a load of dirt in his header, and was waiting for a driver to bring in a car to remove the same, and that while waiting it was his custom to stand at the northeast corner of the break-through, which was about ten feet north from the header at which he was working, and when the empty cars arrived, he would place the cars in position, and after loading would bring them out from his header and deliver them to the mule driver; that it was plaintiff's duty to take empties from the mule driver and to get them off the main entry track so as to be fully "in the clear"; and that the empties were either kept in his header or run into the break-through. It is further claimed and there was evidence tending to show that on the day of the accident plaintiff had difficulty in sledging down his coal, and, finding that he did not have the necessary wedges to properly do the work, the same not being ordinarily kept in a miner's set of tools, he went to the head of the fifth north entry, where two miners were at work on the face of the coal, borrowed the necessary wedges, and returned to his header, and by the aid thereof succeeded in making his coal fall down, and thereupon returned the wedges to the persons from whom he had borrowed them, and upon his return, and when he had arrived at the north corner of the break-through, some "bastard rock" fell upon him, and produced the injuries of which he complains. There is ample testimony to support the charge of negligence. Indeed,

defendant makes no point in argument that there was not sufficient evidence to support a finding of negligence in allowing this bastard rock to remain over the entry.

We here attach a plat, which, aside from the cross placed thereon to show the place where plaintiff was injured, is substantially correct.

I.   The propositions relied upon for a reversal are few, and they may be stated as follows: It is insisted that the trial court was in error in allowing certain testimony as to a custom in the mine; in overruling defendant's motion for a directed verdict: and in giving one of its instructions to the jury. Certain rulings on the admission of testimony are complained of, which will also be noticed.

1. MINES AND MINING: negligence: safe place to work: evidence: instructions.

The alleged errors center around one or two fundamental propositions. Plaintiff was permitted to show, over defendant's objections, a custom among the miners to borrow tools from each other. The following is a sample of the questions and answers: ''Q. What do you say as to whether or not that was the common practice in this company's mine at and

prior to the time the plaintiff was hurt, for the miners to borrow and lend their tools in the prosecution of their work— the general practice in that mine? (Objection, incompetent, immaterial, irrelevant, not a proper subject for testimony as to custom or usage or practice. Overruled, and excepted.) A. That is practiced quite a bit; yes, sir. Q. Is that a common practice among the miners at that mine, and was at that time? (Objection, incompetent, immaterial, irrelevant. Overruled, and excepted to.) A. Yes, sir.'' This was followed by other testimony of like kind, and plaintiff concluded his testimony as follows: ''Wedges are necessary in order to do the work. I put the wedges at the top of the coal and force it down. Q. What do you know as to whether the company knew about this custom of the miners supplying their wedges often by borrowing from other miners, the pit boss that is in charge there? (Objection, incompetent, irrelevant, immaterial, not a proper subject of inquiry by custom, or proof of custom. Overruled and excepted to.) A. I have worked for the day men and borrowed tools for the company. Q. Did the company, the pit boss, or anybody purporting to represent the company, ever make any objection to that custom that you indulged in that the other miners were borrowing one another's tools, to your knowledge? (Objection, incompetent, immaterial, irrelevant, and not a subject of proof by custom.) A. No. sir.'' This latter testimony was received after defendant had moved for a directed verdict, but before plaintiff had fully rested his case.

In this connection the trial court gave the following instructions:

It is the duty of the employer to furnish his employee with a reasonably safe place to work, and if he fails to do so and the employee is thereby injured whilst exercising due care on his own part, the employer is liable for such injury. But this duty to furnish a safe place in which to work is limited to the premises where the employee is required, for the purpose of his employment, to be; it does not extend to his

· protection while upon private excursions outside of those limits, taken solely on his own account, or relating to his own personal convenience.

If, therefore, you find from the evidence that at the time the plaintiff was injured he was not in his working place, but had left it for the purpose of visiting workmen at another place in the mine, for his own convenience or pleasure, and was returning to his place of working, and before he had reached his working place, and before he had reached the usual or ordinary traveled way in going to and from said working place, he was injured by a fall of rock, he cannot recover, and if you so find you should return a verdict for the defendant.

(9) But if you find from the evidence that it was the general custom in this coal district for miners to loan and return working tools to each other, and that in doing so there was a general custom that they should and did use the entry in which mules were used, in going to or coming from such errand of borrowing or returning the tools, and if you further find that plaintiff had borrowed wedges from Alfrey or Llewellyn, who were working at the head of an entry at the time, in which a mule was used, to a place near the end of such entry, and that he had gone to the end of such entry solely for the purpose of returning such wedges to Llewellyn and Alfrey, and for no other purpose, and that at the time he was injured he was returning through said entry to his own place of working, and had reached a point near his own working place when the rock fell on him, he would be entitled to recover, providing you find that the defendant was negligent as charged in the petition, and the plaintiff was exercising due and reasonable care at the time for his own safety.

If you find by the preponderance of the evidence that at the time plaintiff was hurt he had a fall of coal down, but no empty cars into which to load said coal, and that it was his practice to wait in said fifth north entry, at the place where he was when hurt, for said cars, and further find that it was his intention to wait at said place till said empty car or cars arrived, and that plaintiff had a right there, and that it was a company entry, then and in such event, if you so find, you are instructed that he was engaged in prosecution of the work of his master, and that defendant owed him the duty to exercise reasonable care to maintain said fifth north entry, at a

point where plaintiff was injured, in a reasonably safe condition, and if it failed to so do, and plaintiff was not guilty of contributory negligence, then and in such event, your verdict will be for the plaintiff.

The first paragraph of this ninth instruction is challenged and the admission of the testimony and the giving of that part of the instruction are said to be erroneous. It is true, of course, that mere custom, unrelated to the management of the mine, or one having no connection with the employment, would be inadmissible for any purpose. *Kennedy v. Chase,* 119 Cal. 637 (52 Pac. 33, 63 Am. St. Rep. 153) ; *Ellsworth v. Metheney,* 104 Fed. 119 (44 C. C. A. 484, 51 L. R. A. 389) ; *Wright v. Rawson,* 52 Iowa 329.

In the latter case this court said:

When the accident happened it clearly appears that the intestate was not engaged in mining, which was his employment; that his proper place was not in the room where he was injured, but, on the contrary, he was a visitor for his own pleasure or amusement. The intestate, not being engaged in his employment, was in the same position of a visitor to the mine. As an employee, having voluntarily put himself in danger, he cannot recover. . . . The custom of miners to visit their fellow workmen, and the acquiescence of the defendant in such custom, cannot be regarded as an invitation for the workmen to leave their proper places and frequent dangerous parts of the mine at the risk of the defendant.

Appellant's counsel also cite *Pioneer Min. & Mfg. Co. v. Talley,* 152 Ala. 162 (43 South. 800), also reported in 12 L. R. A. (N. S.) 861, as being closely in point. In that case the injured party was going after his own tools, which he had loaned, and the court held that "he was thus engaged in his own business, and not in that of defendant. When he did this, leaving his own place of labor for the purposes specified, he assumed the risk incident to the route voluntarily selected by him." The court also said: "To lend their working implements to

each other, with which the laborers were to furnish themselves at their own expense, and with which the defendant had nothing to do, and was not to furnish, was a habit or custom, as appears, indulged by those working in the mine, for their own convenience.''

The general rule, of course, is that where a servant leaves his working place, and goes to another portion of the mine or place of work for his own purposes and is injured while away from his proper place, the master is not liable for such injuries. Dresser on Employers' Liability, section 104. The reason for the rule is that the master has no reason to anticipate that he will be there for any purpose connected with the work, and therefore is not bound to make any provision for him; and, as appears from the cases cited, a custom of employees, if it relates simply to their own purposes and desires, does not change the rule. The difficulty, of course, is in the application of these rules to the exact facts of each particular case.

The following testimony, in addition to that quoted, will assist somewhat in the solution of the problem in the instant case. Plaintiff testified:

. . . I was hurt ten feet beyond where I worked. I had driven my header in about twelve feet. I was waiting for empty cars. I had just taken some wedges home to Geo. Llewellyn and Alfrey at the head of the entry. I borrowed them that morning. It is the customary practice in the mine to prosecute the work. Q. Borrow one another's tools? (Objection, incompetent, immaterial, and irrelevant. Overruled and excepted to.) A. Yes, sir. Q. How does that occur that you need to borrow one another's wedges, what becomes of your tools? (Objection, incompetent, immaterial, and irrelevant. Overruled and excepted to.) A. Well, for instance, there is lots of time you will need more wedges at one time than another; sometimes drive four or five wedges and sometimes five or six, and men loan them to you, and then if he starts any place sometimes he doesn't have wedges enough when he starts to work. . . . I furnished my own tools. The company furnished none. I had to use picks, shovels, and

wedges. I furnished all I used, except what I borrowed. Those I borrowed belonged to the men, not the company. I had borrowed some from Llewellyn and Alfrey that morning. . . . I stated last evening the last I remember, I had got to a point about to the north edge of the break-through. Q. What do you say as to whether that is the place you ordinarily and customarily waited when waiting for empties to come? (Objection, incompetent, immaterial, and irrelevant, this testimony being offered after the motion had been made in this case, and the rule of the court thereon, incompetent and immaterial; the plaintiff having stated heretofore absolutely that his only business up there at the time he was injured was for the purpose of returning the tools. Objection overruled and excepted to.) A. Yes, sir. I was just returning from Alfrey's when I had returned the wedges. I had just got to the north edge of the break-through. The driver would bring the empties. My place was a small, low place, and, when the break of coal was down, would be no room to wait in. Q. What do you say as to whether that was a matter that was practiced generally by miners in that mine when they were waiting for cars and had nothing to do in their places; that they would go out in the entry and wait for the mule driver to come? (Objection, incompetent, immaterial, irrelevant, and calling for an opinion and conclusion, and not a subject of proof by custom. Overruled and excepted to.) A. Always. I had been up there to Alfrey's returning those tools which I had borrowed, and was on my way back to my place. Q. And had just got, the last you remember, to the place where you was in the habit, as you pointed out, of waiting for the empties? (Objection, leading, suggestive, incompetent, assuming and calling for an opinion and conclusion of the witness. Overruled and excepted to.) A. Yes, sir.

In view of the entire record, we are inclined to the view that the testimony was competent and the instruction correct. In a sense, plaintiff was pursuing a purpose of his own in returning the tools he had borrowed; but in a larger and truer sense he was working for the company, and in what he did was furthering their ends. He might have kept his own tools at a place remote from his work; in fact, the record shows that he could not keep them immediately about him, and would not

ordinarily be required to keep the number of wedges he needed on this occasion immediately at hand. He might store them at any convenient place, and so long as that place did not expose him to any extra hazards—that is, to any hazards not incident to the proper conduct of his work—he was justified in leaving them in an entryway, and in going into the entry to get and to return them. Of course, he could not go to some remote and hazardous place, but if he went through some place which the company was bound to keep safe, for the prosecution of his ordinary work, we think the company was not relieved from responsibility because he went that way, either to get his own tools and return them, or to borrow from and return to others, who, for the time being, made the tools his own. This is especially true where the company knows that the employees were treating their tools as common property by borrowing one from the other, and makes no objection thereto. The mere fact that he was getting borrowed tools does not, as it seems to us, solve the difficulty. True, the purpose may be said to be his own, to get tools from a fellow workman; but the real object was to get tools which were his own for the moment with which to do his employer's work. To say that he is without the pale of the law because the particular tools belonged to another and not to him is too refined, provided, of course, he might have taken the same course, had they been his own. Moreover, it is to be especially noticed that at the place where plaintiff was injured it was defendant's duty to use reasonable care to keep it safe, and at that particular spot plaintiff had a right to be on all occasions incident to the progress of his work. It is not a case where a servant departed from his master's work in order to subserve some purpose wholly his own: as going to visit his fellow workmen; going out of his way while leaving the mine; retiring to some place to answer a call of nature, or something of that kind; as in all but one of the cases relied upon by appellant.

We have recently had a case quite closely in point in

principle at least.   In *Kenis v. Ogden Coal Co.*, 157 Iowa 594, we said:

Without setting out the evidence in detail, it is sufficient to say, in answer to this general contention for the appellant, that there was evidence tending to show that it was the custom of miners, known to defendant, to eat their dinners in the mine at such places as they might select; that the cut-throughs were generally used by the miners as proper places in which to put their dinner pails and leave their tools, and as proper ways in which to pass from one entry to another if there was any occasion to do so, either in the ordinary prosecution of their work, or in case of emergency, and that the defendant has assumed, with reference to the entries and cut-throughs, the duty of maintaining them in a safe condition, and to prevent the falling of the roof therein by props, when necessary.

This quotation points out the distinction between that case and *Wright v. Rawson, supra,* on which defendant so strongly relies.   In the latter case the injured party was not upon any errand which had the slightest connection with his employer's work.   He was at the place of injury for his own pleasure or amusement, just as if he had been a visitor in the mine.

As further illustrating the rule, we quote from the *Ellsworth v. Metheney Case, supra,* the following:

We think there is an aspect of the case which might properly have been submitted to the jury.   There was testimony tending to show that the entry in which Matheney was killed was a place where the miners were accustomed to go at noon for the purpose of eating their dinners and for social intercourse; that this had been the practice in the mine, with the knowledge and without objection from the owner.   In such a case what is the measure of obligation on the part of the employer, and in what relation to him does the employee stand?   Certainly not as a mere stranger to whom no duty is owing.   It is shown to be customary to use the entry as a place where the men come from their room during the short time for refreshment and rest permitted to them in the course of the day's labor.   The master knowing that the entry was so used, and not objecting thereto, impliedly licensed the men to use the place in this manner.

In *Allen v. Railway Company*, 57 Iowa 627, this court, in referring to testimony as to custom, said:

While it was competent for the witness to state, as a fact, what services were performed by the brakeman in the discharge of his duty, they ought not to have been permitted to express an opinion that a particular manner of performing such services was required of him in the discharge of his duty. The duty of a brakeman may be prescribed by a rule of the company employing him, or by the custom prevailing in the operation of railroads. . . . The witnesses could have explained to the jury . . . the usual and customary manner of performing these services, but they ought not to have been permitted to express the opinion as to the plaintiff's care or negligence.

It must be conceded, of course, that the *Pioneer Mining & Mfg. Co.* case supports defendant's position; but we think it makes too nice distinctions and is unsound in principle.

In *Grannis v. Railroad Co.*, 81 Iowa 447, this court said it is a matter of some doubt whether the plaintiff was by his employment required to perform this service, but we think the jury was warranted in finding he was in the line of his employment, and was not for that reason precluded from recovering for his injuries. It would be unjust to draw nice distinctions, in a question like this, as to when the plaintiff was required to take upon himself the duties pertaining to his employment. See, also, *Ferguson v. Railroad Co.*, 58 Iowa 293.

The Michigan court said: "Plaintiff during intermission was at liberty to go where he pleased, not obliged to stay on premises, and could not be considered a loiterer or trespasser; . . . having been accustomed to bring dinner, he was not obliged to go on the street to eat it. There was an implied permission to remain on the premises." *Broderick v. Depot Co.*, 56 Mich. 261 (22 N. W. 802, 56 Am. Rep. 382). See, also, *Short v. Power Co.*, 149 Iowa 309; *Grimm v. Power Co.*, 79 Neb. 387 (112 N. W. 620). Also, Labatt on Master & Serv-

ant, 18674; *Butler v. Railroad Company*, 87 Iowa 206; *Morbey v. Railroad Company*, 105 Iowa, 46.

In the *Broderick* case, it was said: "No objection to plaintiff's presence was made by the superintendent, and we think the jury justified in finding plaintiff was there with the distinct approval of defendant, and that he was not outside of the scope of his employment."

Although the point is a nice one, we are constrained to hold there was no error in receiving the testimony or in the instructions given. Had plaintiff been hurt in a place where he was not authorized to go; or in a room where tools were used by other employees, they being responsible only for the condition of the room, a different question would be presented. But such is not the case presented by this record, and we do not think that tools were borrowed is in itself a controlling feature, especially in view of the fact that plaintiff was hurt in a place where he had a right to be in the pursuit of his ordinary duties. This discussion disposes of the two main propositions in the case.

II. The motion to direct was filed before plaintiff had completed the taking of his testimony, although the trial court said in its ruling that it did not consider any evidence received after the motion was filed. As the defendant did not elect to stand on its motion, and as plaintiff was permitted to introduce additional testimony, the defendant has no right to insist at this time that its motion should have been sustained. Defendant introduced its testimony, and the case went to the jury, and, under familiar decisions, the only question which may now be presented is the sufficiency of the entire testimony to support the verdict. In view of our conclusions on the law of the case, it is manifest that the verdict has support.

2. PRACTICE: motion to direct verdict: waiver.

III. Many other rulings on the admission of testimony are complained of. Most of these were right, but some were

clearly erroneous.   As the testimony, however, did not bear
upon any of the really disputed issues of fact,
and in some instances related to questions of
law, which were practically undisputed, they
are not of sufficient importance to justify
separate consideration; and, as they do not, in any manner,
affect the real merits of the controversy, we pass them simply
with the remark that appellee's counsel in their zeal insisted
upon questions which they should have known were aside from
the mark.   Some day counsel will learn that it is not safe prac-
tice to insist upon questions which, in their sober moments,
they know are irrelevant, if not improper.   It will save courts
much trouble and criticism if attorneys pay some attention
to the record and try their cases, not only with reference to
present, but also to final, results.

3. APPEAL: erro-
neous rulings:
harmless
error.

No prejudicial error appears, and the judgment must
be and it is *Affirmed.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concur-
ring.